## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

F I L E D

JAN 1 3 2020

CLERK'S OFFICE
DETROIT

------------------------------------ X

STEPHEN ██████ ██████ YOUNG

                 PLAINTIFF,

       vs.

THE UNIVERSITY OF HAWAII;

     WILLIAM S. RICHARDSON SCHOOL
     OF LAW;
     AVIAM SOIFER;
     DENISE ANTOLINI;
     RONETTE KAWAKAMI;
     HEATHER SMITH-LEE; and
     MARI MATSUDA

THE AMERICAN BAR ASSOCIATION;

     AMERICAN BAR ASSOCIATION LEGAL
     EDUCATION "SECTION"

THOMSON REUTERS, Inc.; and

     WILLIAM ██████ VOGELER

BREAKING MEDIA Inc.

     KATHRYN RUBINO

                DEFENDANTS.

------------------------------------ X

**Docket No.:**
2:19-cv-13559

**DOCUMENT TITLE:**

**Plaintiff's Response to
Court's Order to Show
Cause**

**Judge:**
Honorable Arthur J. Tarnow

**Magistrate Judge:**
Honorable David R. Grand

# TABLE OF CONTENTS

**PRELIMINARY STATEMENTS** ..................................................................................... 2

**SECTION 1 – FORUM NON CONVENIENS** ............................................................... 3

ISSUE 1A: FORUM NON CONVENIENS GENERAL DISCUSSION ...................................... 3

ISSUE 1B: RELATIONSHIP BETWEEN FORUM NON CONVENIENS AND FORUM
SELECTION CLAUSES ............................................................................................. 8

**SECTION 2 – ALTERNATE FORUM IS NOT AN APPROPRIATE FORUM** .................. 9

ISSUE 2A: ALTERNATE FORUM WOULD BE SO SERIOUSLY PREJUDICIAL TO THE
PLAINTIFF AS TO PREVENT JUSTICE .......................................................................... 10

ISSUE 2B: THE FEDERAL DISTRICT COURT FOR THE FEDERAL DISTRICT OF HAWAII
WOULD BE INEFFECTIVE _AND_ UNFAIRLY HANDLE THE SUIT ....................................... 10

ISSUE 2C: CHANGING THE VENUE TO THE FEDERAL DISTRICT COURT FOR THE
DISTRICT OF HAWAII WOULD BE SO SERIOUSLY INCONVENIENT SUCH THAT REQUIRING
THE PLAINTIFF TO BRING SUIT THERE WOULD BE UNJUST ............................................. 13

**SECTION 3 – WITNESSES AND CONVENIENCE OF WITNESSES** ............................... 13

ISSUE 3A: ANTICIPATED WITNESSES AND NATURE OF REQUIRED DISCOVERY AND
TESTIMONY ............................................................................................................. 13

**SECTION 4 – DISCUSSION REGARDING ANTITRUST CAUSE OF ACTION** ............. 17

ISSUE 4A: SIGNIFICANCE OF ANTITRUST CAUSE OF ACTION IN COMPLAINT .............. 17

ISSUE 4B: SPECIFIC EVIDENCE SUPPORTING ANTITRUST CAUSE OF ACTION .............. 19

ISSUE 4C: OVERWHELMING PUBLIC INTEREST IN THE ANTITRUST CAUSE OF ACTION
BEING HEARD FAIRLY AND IN A TRANSPARENT MANNER .......................................... 23

**Plaintiff's Response to the Court's Order for Show Cause Why a Sua Sponte Motion for Forum Non Conveniens Should not be Granted**

## Preliminary Statements

1.      The Plaintiff would like to formally apologize to the Federal District Court for the Eastern District of Michigan for not providing a printed courtesy copy of the Complaint's Appendix, or filing a printed copy (or digital media equivalent) of the Complaint's Appendix, and relying on an attempt to disseminate information digitally despite being unable to file electronically. The Plaintiff was made aware of a potential issue of ex-parte communications with the court in a conversation with the Detroit Mercy Pro Se Clinic on December 18, 2019 at 04:21PM (EST); as a direct result he will submit a digital copy in the form of a CD/DVD/USB Data Storage Device of the Complaint Appendix in redacted format (henceforth "Complaint Appendix Redacted for Public Release") to the Federal District Court for the Eastern District of Michigan  and printed courtesy copy in non-redacted format for the Honorable Judge Arthur J. Tarnow as required in the Judge's Standing Orders. A large amount of confusion likely resulted from this mistake and the Plaintiff appreciates the Federal District Court's patience and permission to address and remedy the issue.

2.      Additionally, the Plaintiff will submit all additional documents, and supplemental materials, in one of the electronic formats mentioned in ¶ 1. This will include, at a minimum, three binders of preliminary evidence exhibits related to the Plaintiff's Response to the Court's Order to Show Cause Why a Sua Sponte Motion for Forum Non Conveniens Should not be Granted and a fourth binder with the Complaint and Complaint Appendix. The evidence exhibits being submitted currently are preliminary evidence exhibits and will likely be altered in numbering for official exhibits in the event of a trial. As a result, the evidence exhibits are being

marked with "P-" prior to the exhibit number. This evidence exhibit marking is being done in an attempt to make it easier for finding and referencing evidence; especially in cases where page numbers were not printed for the entire series as is the case with what will be referenced as "Support for Plaintiff's Response to the Court's Show Cause Order #1".

## Section 1 – Forum Non Conveniens

### Issue 1A: Forum Non Conveniens General Discussion

3. The two factors which determine whether a forum non conveniens motion, under 28 U.S.C. § 1404 (a), should be granted are that (1) an alternate forum is available and adequate to hear the case; and (2) that the balance of private and public interests demonstrate the forum is actually unnecessarily burdensome to a Defendant or the Court.

> 4. A dismissal on forum non conveniens grounds is appropriate when the defendant establishes, first, that the claim can be heard in an available and adequate alternative forum and, second, that the balance of private and public factors listed in Gulf Oil, 330 U.S. at 508-09, 67 S.Ct. 839, reveals that trial in the chosen forum would be unnecessarily burdensome to the defendant or the court. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

*Duha v. Agrium, Inc.*, 448 F.3d 867, 873 (6th Cir. 2006).

5. The current legal standard in the 6th Circuit Court is when a Plaintiff is able to make a "real showing" of convenience in his home forum in which he sued; this should normally overcome a forum non conveniens motion by a Defendant. While this motion for forum non conveniens was brought Sua Sponte by the Federal District Court for the Eastern District of Michigan, it is only reasonable to extend the existing 6th Circuit Court rule such that when a Plaintiff can make a real showing of convenience in his home forum it should outweigh the inconvenience of Defendants presented in the Sua Sponte Motion by a Court.

6. In Koster [*Koster v. American Lumbermens Mutual Casualty Co.*, 330 U.S. at 524, 67 S.Ct. 828 (1947)], we stated that '[in] any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.'

*Duha,* 448 F.3d at 874.

7. Four factors demonstrate a real showing of convenience for the Plaintiff in his home forum in this case: the relative financial power of the Defendants relative to the Plaintiff; the fact the Plaintiff attempted to obtain legal counsel in the State of Hawaii, was unable to, and as a result even if a motion for appointment of legal counsel provided under 28 U.S.C. § 1915 (e)(1) (or even legal counsel in a mentoring role) were granted, the rules in Hawaii, *See* Haw. Super. Ct. R. 1.9(d-f), would bar the appointed counsel from participation; the Defendant Ronette Kawakami, and by extension the University of Hawaii and WSRSL, tampered with the witnesses, jury pool, and ability to obtain legal counsel in Honolulu, Hawaii as stated in the Complaint; and the Plaintiff suffers from Complex PTSD, as a direct result of the repeated traumas which occurred in Hawaii at the hands of the Defendants in Hawaii.

8. In this situation, the Plaintiff cannot be expected to compete with the resources of a State University (the University of Hawaii), a multinational corporation headquartered in Toronto, Canada (Thomson Reuters), arguably the largest legal entity in the United States (the American Bar Association), or even the comparatively small Breaking Media company. Any inconvenience due to travel costs for any of the Defendants would be offset by their incredibly large amount of financial resources. Whereas, if the Plaintiff were to have to litigate in Hawaii, the cost burden would be high enough to prohibit the Plaintiff from pursuing litigation based solely on the costs of living and travel expenses related to Honolulu, Hawaii.

9. The Plaintiff has demonstrated a lack of financial resources in the Motion to Proceed in Forma Papyrus as filed with the Federal District Court for the Eastern District of

Michigan Clerk's Office on December 3, 2019. If there were any doubts as to the lack of financial resources available, the net worth of the Plaintiff can be measured by his student loan debt as it is significantly larger than all of the Plaintiff's assets combined at approximately $150,000.

10. The Plaintiff intends to file a motion with the court for legal representation, or legal assistants, to assist with the case given the sheer size and complexity of the issues being presented. *See* Complaint Appendix § A.5 regarding Plaintiff's list of motions. The Plaintiff can request this on the grounds of 28 U.S.C. § 1915 (e)(1) which states, "The court may request an attorney to represent any person unable to afford counsel".

11. The Plaintiff can demonstrate he attempted to obtain legal counsel in the State of Hawaii and was unable to do so (largely based on the actions of the defendants in Hawaii). The State Bar for Hawaii prohibits lawyers from outside of the Bar Association from practicing in the State of Hawaii unless they are able to appear pro hac vice with a sponsored member of the Hawaiian Bar Association appearing as head counsel. (This is in stark contrast to the policy in Michigan permitting a Bar licensed attorney from any state to apply for admission to practice law.) State of Hawaii Supreme Court Rule 1.9 makes a change in venue incredibly burdensome to the Plaintiff in this legal case and would be very burdensome to fellow Defendants Thomson Reuters and Breaking Media.

12. The Federal District Court for the District of Hawaii is located in Honolulu, Hawaii. Based on the behavior of the Defendants at the University of Hawaii it can be inferred from the number of laws stated to be violated in the Complaint that the Defendants have two beliefs or objectives; (1) For the case to be heard at the Federal District Court for the District of Hawaii; and (2) Once the case is located in the Federal District Court for the District of

Hawaii take advantage of the combination of the prejudice of the District Court for the University of Hawaii, and State of Hawaii Entities in General, and exploit the attempts to obstruct justice by ensuring the Plaintiff is judged on the libelous articles written about him prior to any evidence being presented in the case. The Defendants are also well aware of the racial discrimination rampant in the area around Honolulu with regard to people from the Continental United States and people who appear "white" or are of primarily Caucasian ancestry.

13. The Plaintiff incorporates, as if stated herein, Preliminary Evidence Exhibit P-29, "Facebook Conversation #1 with Doe Witness 1", regarding the knowledge of the Above the Law Article and the fact the witness was aware the law firms in Honolulu had knowledge of both the photographs of the filed Complaint prior to the Above the Law Article's publication (which has still not been formally requested for viewing as demonstrated in Plaintiff's Preliminary Exhibit P-2.1: "Printable Case View Dated December 21, 2019 at 07:29 AM HST") and Plaintiff's Preliminary Evidence Exhibit P-22.1 containing the source code for the Above the Law Article written by Kathryn Rubino with the date originally published and the date modified.

14. The Plaintiff must correct a factual mistake in the Complaint, specifically in ¶ 157. The Plaintiff stated the date of the request being denied was April 19, 2019, the case was unofficially dismissed on April 19, 2019, and the case was formally dismissed on April 22, 2019. The actual dates should be as follows: Request for Reconsideration was filed on April 18, 2019; Request Denied on April 26, 2019; Case Unofficially Dismissed on April 26, 2019; and Case Officially Dismissed on April 29, 2019. The Plaintiff formally apologies for this error and will rectify this in a First Amended Complaint. (Docket No. 1 and Ex. P-2.1).

15. The Plaintiff has been diagnosed as having Complex PTSD as demonstrated in the medical files in Plaintiff's Preliminary Evidence Exhibit P-20, as well as statements made in email to the Defendants in this case in Plaintiff's Preliminary Evidence Exhibits P-1.4, P-1.6, and P-1.7. The Plaintiff had never been diagnosed with PTSD, in any form, prior to returning from Hawaii. (*See* Ex. P-20). As a result of the diagnoses of PTSD occurring after the Plaintiff returned from Hawaii, the fact the witnesses who would be interviewed in Hawaii are both actual and proximate cause of the PTSD, and the Plaintiff has demonstrated beyond a reasonable doubt the desire to not need to return to the State of Hawaii at any point in his lifetime; it is reasonable to question whether the Plaintiff would be able to litigate this case if it were in the State of Hawaii under the circumstances. Even if the Plaintiff would be able to litigate the matter in the State of Hawaii, the likely price would be significant emotional and psychological shocks which would already compound the Complex PTSD issues.

16. As a result of the probable inability for the Plaintiff to even litigate the case in a pro se capacity, due to the high probability of harm to the Plaintiff psychologically by returning him to the State of Hawaii where the original injuries occurred (Complex PTSD differs from PTSD in that it develops over a sustained period of repeated and significant psychological traumas), combined with the fact the Plaintiff had tried to obtain legal counsel even before the attempt by Associate Dean Ronnette Kawakami to intimidate witnesses and potential legal counsel the Plaintiff could secure (Ex. P-24). The Plaintiff argues these facts constitute a significant real showing of Plaintiff convenience in bringing suit in his home state as opposed to the Federal District Court for the District of Hawaii.

17. The Combination of ¶ 3-13 and ¶ 15-16 demonstrate the selection of the Federal District Court for the Eastern District of Michigan was made both out of convenience to

the Plaintiff (and non-Hawaiian defendants) and as justice requires because the substantial inconvenience of the Plaintiff by the venue being in Hawaii is prejudicial to the point of forcing the Plaintiff to choose between seeking justice in this case, which would only be possible if the Federal District Court for the District of Hawaii were willing to grant an injunction providing equitable relief necessary to offset the tremendous cost burden for the Plaintiff, and both maintaining the psychological health of the Plaintiff and preventing further relapses related to subjecting a person diagnosed with Complex PTSD from returning to the location where the PTSD originated and having to essentially relive the experience throughout a prolonged litigation case. The Plaintiff argues the prior statement alone precludes a reasonable transfer of venue to the Federal District Court ignoring every other factor listed in the Plaintiff's Response to the Court's Order to Show Cause why the venue should not be transferred to Hawaii under 28 U.S.C. § 1404 (a).

### Issue 1B: Relationship Between Forum Non Conveniens and Forum Selection Clauses

18.     Forum non conveniens dictates that a forum which is an unnecessarily burdensome venue for a Defendant should be changed to a venue which is appropriate yet less burdensome. Traditionally weight has been given to the Plaintiff's choice of venue with a balancing test between what is convenient for the Plaintiff, the choice of the Plaintiff, what is convenient for the Defendant(s), and what is necessary for justice to occur.

19.     In a similar manner, a forum selection clause in a contract attempts to serve a similar function without a court needing to intervene. The role of the Plaintiff in this case is switched to the party dictating the terms of the contract and the role of the Defendant is switched to the party which is agreeing to the contract. Courts primarily intervene when justice

requires in order to ensure public policy is served by the venue of litigation and that the parties were both in a position to fairly negotiate the terms as is standard with any contract.

20.    In both cases, the venue selected, as well as any alternate venues, must be appropriate for the case to be heard. The metrics for evaluating a forum as appropriate are largely the same; however, the Plaintiff has found significantly more case law and case law which is more applicable to the specifics of this situation within the realm of forum selection clause rulings. The two concepts even become intertwined in cases as can be seen in the specific case of *Wong v. PartyGaming Ltd.*, 589 F.3d 821 (6th Cir. 2009) referenced by the Court in the Order to Show Cause why the venue should not be moved to the Federal District Court for the District of Hawaii.

## Section 2 – Alternate Forum is Not an Appropriate Forum

21.    The first step in evaluating a forum non conveniens motion is to analyze whether the proposed forum is, in fact, an appropriate alternative forum. *See Duha, 448 F.3d at 873*.

22.    As expressed in ¶ 18-20, the doctrine of forum non conveniens and analysis of the enforceability of a forum selection clause are related enough to apply principles of the analysis of the enforceability of a forum selection clause to an analysis on the doctrine of forum non conveniens. As a result, the Plaintiff requests the Court look to Wong for guidance on the appropriateness of a venue.

23.    When evaluating the enforceability of a forum selection clause, this court looks to the following factors: (1) ... (2) whether the designated forum would ineffectively or unfairly handle the suit; and (3) whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust.

*Wong*, 589 F.3d at 828.

**Issue 2A: Alternate Forum Would be So Seriously Prejudicial to the Plaintiff as to Prevent Justice**

24.     The Plaintiff repeats and realleges ¶ 3-13 and ¶ 15-17 hereof, as if fully set forth herein.

25.     The Plaintiff argues the proposed alternate venue would be so prejudicial to the Plaintiff, due to the high potential for negative health impacts expressed in the previous sections, that a decision to move the venue to the Federal District Court for the District of Hawaii would violate the Plaintiff's constitutionally protected rights (afforded to the Plaintiff by the U.S. Constitution 5th Amendment) by forcing him to choose between pursing justice and attempting to avoid unnecessary psychological harm which would have an extremely high probably of occurring.

> 26.     No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, ***nor be deprived of life, liberty, or property, without due process of law***; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V, full text

27.     In this case, being forced to choose between psychological health and being able to bring forth a legal case in Federal Court would be forcing the Plaintiff to choose between depriving himself of life and depriving himself of liberty and property; something which is fundamentally unconstitutional on 5th Amendment grounds. *See Id.*

**Issue 2B: The Federal District Court For The Federal District of Hawaii Would Be Ineffective _and_ Unfairly Handle the Suit**

28.     Under the second factor, plaintiffs must show that a Gibraltar court would ineffectively or unfairly handle the suit. Sec. Watch. In., 176 F.3d at 375. Different or less favorable foreign law or procedure alone does not satisfy this

prong. Shell, 55 F.3d at 1230. Rather, the foreign law much be such that a risk exists that the litigants will be denied any remedy or will be treated unfairly. Id. ... Plaintiffs contend that Gibraltar would not be an adequate forum because (1) Gibraltar does not allow jury trials and (2) Gibraltar does not allow class-action suits for damages.

*Wong*, 589 F.3d at 829.

29. "As to the plaintiff's first claim, this argument ignores our precedent upholding an alternative forum even when jury trials were unavailable. *See Interamerican Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487, 489 (6th Cir. 1992). ... Thus, plaintiff's first argument lacks merit." *Wong*, 589 F.3d at 829.

30. "The fact that parties will have to structure their case differently than if they were litigating in federal court is not a sufficient reason to defeat a forum selection clause." *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1231 (6th Cir. 1995). Plaintiffs have not alleged that they could not bring the suit in Gibraltar, but only that they could not bring it in class form. Thus, they have not shown that Gibraltar would be an ineffective or unfair forum.

*Wong*, 589 F.3d at 829.

31. The Plaintiff references Plaintiff's Evidence Exhibits P-2; P-3; and P-4; as if contained herein. The evidence exhibits referenced are cases which demonstrate the judicial system in Hawaii is prejudicial and biased. From the 1st Circuit Court in the Plaintiff's initial case in exhibit 2 to the Federal District Court for the District of Hawaii in exhibits 3 and 4, the University of Hawaii defies the laws of probability in the amount of success they experience in litigation which occurs in the State of Hawaii. Plaintiff's Evidence Exhibit P-5.7 demonstrates cases where the University of Hawaii was sued pursuant to Haw. Rev. Stat. 304A-108; almost every ruling was in favor of the University of Hawaii.

32. The Plaintiff was so disturbed by the judicial conduct he observed in the Circuit Court in Hawaii, he became demoralized to the point of questioning whether the entire

legal system in the United States was as corrupted and broken as it is in the State of Hawaii. (Ex. P-27.1 and P-27.2).

33.     In addition to the nature of legal suits (almost) always going in favor of the University of Hawaii in the Federal District Court for the District of Hawaii, several other factors further decrease the probability of the Plaintiff receiving a fair trial in the State of Hawaii. The first factor is that Ronette Kawakami is the Chair of the Judicial Selection Commission for the State of Hawaii and was nominated to the position by the Hawaii Bar Association. Furthermore, Ronette Kawakami is the WSRSL Inns of Court head and not only runs the meetings but has opportunities for ex-parte communication with judges at all levels of the Hawaii Judiciary. If the mere prospect of impropriety warrants the recusal of a judge, as is stated in the U.S. Judicial Code, the entire Federal District Court for the District of Hawaii would need to recuse themselves due to the appearance of impropriety based on the spread of evidence and the fact the Chairman of the Hawaii Judicial Selection Commission is a key Defendant in this case.

34.     While the Plaintiff is hesitant to directly say the Federal District Court for the District of Hawaii is corrupt and unjust towards litigants suing the University of Hawaii; the evidence the Plaintiff has seen based on analysis of the rulings and judicial opinions in the cases cited makes it difficult to come to any other conclusion. The issue of racism and discrimination based on location of origin may play a factor however the Plaintiff can only speculate on that and as a result only notes the level of racism which exists in Hawaii is so prevalent to make a student who was raised in Hawaii ask the Plaintiff if he really didn't know about the racism in Hawaii before arriving there. If the racism could be so obvious as it was to a person who consistently argued with the Plaintiff regarding whether or not discrimination existed in Hawaii, the

likelihood racism has become ingrained in the culture and politics in the city of Honolulu is very high. Given the Federal District Court for the District of Hawaii is located in Honolulu, Hawaii, the Plaintiff believes it is fair to ask if race or location of origin would impact the effectiveness and fairness of a trial held in that District Court.

35. The Plaintiff would like to specifically note this does not apply to all Hawaiians as there are many who are not racist or despise the Continental United States for events which occurred over 100 years ago. Upon discussing the matter with people born, and raised, in Hawaii (and especially people registered as Native Hawaiian), the largest level of racism appears to exist with people who are both Hawaiian and Japanese. In this case, both Ronette Kawakami and Mari Matsuda have Hawaiian and Japanese heritage and in both of their actions prejudicial motives appear clearly.

36. If there is even a chance that racial prejudice would corrupt the case the Plaintiff respectfully requests the Federal Circuit Court rule the District Court in Hawaii is not an appropriate venue.

### Issue 2C: Changing the Venue to the Federal District Court for the District of Hawaii Would be so seriously inconvenient such that requiring the Plaintiff to bring suit there would be unjust

37. Plaintiff repeats and realleges ¶ 3-13 and ¶ 15-17 hereof, as if fully set forth herein.

## Section 3 – Witnesses and Convenience of Witnesses

### Issue 3A: Anticipated Witnesses and Nature of Required Discovery and Testimony

38. A key factor not taken into account in the Court's Order to Show Cause why the venue should not be changed to the Federal District Court for the District of Hawaii is the anticipated testimony of the witnesses. This was an unintended consequence of the Plaintiff having submitted evidence in a manner which the Honorable Judge Arthur J. Tarnow was unable

to access and as a result the Plaintiff would like to officially note the issue is the direct result of the Plaintiff's mistake and the fact it was not taken into account was beyond the ability of the Court to consider.

39.     As demonstrated in the previous section regarding expected witnesses, and the evidence which is now properly submitted to the Federal District Court for the District of Michigan, most of the witnesses in Hawaii have already had the vast majority of testimony memorialized in email evidence exhibits. When considering additional information provided by the Plaintiff for both context and comparison, the issue of determining the location for witnesses likely to testify is based on the limited testimonial value of the Defendants in Hawaii.

40.     "Furthermore, the district court improperly focused on the number of witnesses in each location. Instead, the court should have examined the materiality and importance of the anticipated witnesses' testimony and then determined their accessibility and convenience to the forum." *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335–36 (9th Cir. 1984).

41.     The 9th Appellate Court, relevant largely because the proposed alternate forum resides in the 9th Circuit, further expands on the location of witnesses in Jensen to include a definition of "vast majority" with regard to where the witnesses are located.

> 42.     We also observe that the private interest factors mentioned by the district court do not strongly support the defendants' position on forum non conveniens. The district court noted that "the vast majority of the witnesses reside in the Philippines ...." Gates Learjet II, slip op. at 9. The defendants, however, admit that the district court was not absolutely correct. In fact, 23 of the 44 witnesses, whom the parties designated in response to interrogatories, reside in the Philippines, which is hardly a "vast majority".

*Jensen* 743 F.2d at 1335.

43.     The 9th Circuit Court also considers the issue of increased speed of travel

and communication, in 1981 no less, and how the argument of a forum being inconvenient has

changed relative to the Supreme Court's decision in Gilbert regarding forum non conveniens.

The fact this opinion was written 38 years prior to this case, with technological advancement far

exceeding the change in technology from the previous 33 years, only further demonstrates the

point a forum is significantly less inconvenient with regard to physical location than it has ever

been before. The Plaintiff will further elaborate on some of these technological changes in the

section on proposed solution for witnesses (Issue 4D).

> 44.     We also note that a district court should keep in mind that "the
> increased speed and ease of travel and communication ... makes, especially when a
> key issue is the location of witnesses, no forum 'as inconvenient [today] as it was
> in 1947,' " when the Supreme Court decided Gilbert. Manu International, S.A. v.
> Avon Products, Inc., 641 F.2d 62, 65 (2d Cir.1981).

*Jensen* 743 F.2d at 1336.

45.     The Plaintiff intends to depose witnesses from the State of Washington,

depose and have testify a large number of witnesses in the States of Illinois and Michigan, and

depose a substantial number of people who, at least on a part-time basis, reside in the District of

Columbia; makes it difficult to say the Defendants in Hawaii, or the witnesses in Hawaii, stand

to be any more inconvenienced than other witnesses (who were not at fault and have violated no

sections of the U.S. Code, or live close enough to the State of Michigan). As a result, the forum

selection in Michigan is entirely reasonable given the information necessary to proceed in this

case through discovery and testimony will largely be based on the antitrust issue despite the fact

it is only included in the original complaint in minor way by being combined within a RICO

Predicate Act.

46.     This will certainly change in the Plaintiff's First Amended Complaint which will add a significant violation of Section II of the Sherman Act and likely require the addition of parties currently not included in the initial complaint. These parties will likely include the AALS, the NCBE, the LSAC (the only entity which is not guaranteed to be included at this point), the Judicial Selection Commission for the State of Hawaii, the State of Michigan Bar Association, and the State of Michigan Board of Law Examiners. This will be discussed in significantly greater detail in Section 4, Issues 4A-5C.

47.     The Plaintiff has created two variants of expected witness lists depending on the extent to which the University of Hawaii wishes to contest every possible issue despite having the required knowledge to admit a large number of issues. The most likely outcome is the Associate General Counsel for the University of Hawaii will concede issues which are documented directly in evidence, or the issues become removed from the case in a motion for summary judgment immediately upon receipt of the Defendants' answers.

48.     As a result, the Plaintiff specifically references Plaintiff's Evidence Exhibit (Redacted in the Court Docket to preserve Work Product Immunity) P-32.1 - "Expected Witness List" as if contained herein.

49.     Ignoring the fact there are likely to be a substantial number of witnesses who are not yet identified, as a result of the additional parties and discovery regarding the site visits to the University of Hawaii and requested universities, 22 witnesses currently exist that the Plaintiff has reason to expect the parties to call. Of those 22 witnesses, 9 reside in the State of Hawaii. This is also excluding the Plaintiff who, unless the Defense calls as a witness, does not currently planning to testify. 1 of the 9 people in Hawaii will need to be a Doe Witness explicitly for the person's protection as stated in the motion to seal the case records. Based on the recorded

conversations and emails there appears to be little Ronette Kawakami, Aviam Soifer, Denise Antolini, Heather Smith-Lee, or Mari Matsuda could add by being physically present to testify.

50.     As stated in the Complaint, the number of issues which exist with regard to the University of Hawaii, which is now supported by substantial evidence as submitted alongside this response filing, are very low. The number of issues requiring anyone to testify, assuming the person would be truthful and forthcoming with evidence which they probably should claim their 5th Amendment right to not incriminate themselves given the criminal nature of RICO and Sherman Act violations, renders most of the remaining evidence involving the State of Hawaii to be in obtainable in electronic discovery. When combined with the fact technology makes it entirely possible to have people testify from the State of Hawaii in a trial located in the State of Michigan; the inconvenience of the Defendants and witnesses from Hawaii appears to be almost non-existent relative to the inconvenience the Plaintiff and closer defendants and witnesses would experience.

## Section 4 – Discussion Regarding Antitrust Cause of Action

### Issue 4A: Significance of Antitrust Cause of Action in Complaint

51.     The alleged antitrust violation will be significantly expanded in the First Amended Complaint to include violations of Section II of the Sherman Act with regard to the following entities: the American Bar Association and the American Bar Association's Legal Education and Accreditation "Section"; the University of Hawaii and the William S. Richardson School of Law; the Association of American Law Schools; the National Commission of Bar Examiners; the State of Michigan Bar Association; the State of Michigan Board of Law Examiners; the Judicial Selection Commission for the State of Hawaii; and potentially the LSAC.

52.     The LSAC may be added as the Plaintiff notes they definitely participate in anticompetitive behavior however, with the GRE being permitted in some circumstances in place of the LSAT, they are the only entity facing actual competition as the market requires and aside from their monopoly in processing Law School Applications (almost every law school in the United States which is accredited by the American Bar Association utilizes their services). Furthermore, the LSAC is a minor contributor to the overall antitrust violations of the other entities despite explicitly violating antitrust regulations by inflating the cost of processing law school applications based on the fact their services provide very little value relative to the cost charged; which is a clear indication of a monopoly exploiting the market to their advantage.

53.     The reasons to include the LSAC are the fact they are definitely in violation of Section II of the Sherman Act, are exploiting the market for processing law school applicants by charging rates well above marginal cost, and the fact the American Bar Association's "Section" has provisions in place which dictate rules for permitting the GRE in place of the LSAT which are anticompetitive in nature and can only be construed as to provide a significant barrier to entry to real competition for the LSAT Exam.

54.     The primary reason to not include the LSAC is the additional time and burden on the Plaintiff to establish what amounts to a second antitrust violation. Further, the fact that once the primary antitrust violation has been settled in court the number of people who have been victimized by the LSAC, who have access to a lawyer without reason to fear the LSAC or retaliation, will make litigation of the second antitrust violation exponentially easier and likely a class action antitrust suit which the Plaintiff is unwilling to bring at this time.

55.     As a result of the issues discussed in ¶ 52-54, the Plaintiff is highly unlikely to pursue the antitrust claim against the LSAC due to it being of minimal significance

relative to the primary antitrust claim asserted and would waste the extremely limited resources of the Plaintiff in this case.

56.     Each of the entities named in ¶ 51 will be alleged (or explicitly fact plead) to have participated in a scheme to limit competition among both law schools and perspective lawyers; conspired directly with other named entities associated with the alleged antitrust violation; directly caused the legal education in the United States to become void of actual innovation, quality educational value, and governmental oversight through the use of both fraud and monopoly power which removes both the Noerr-Pennington Immunity Defense and the Parker Immunity Defense; with an obvious and tremendous impact on both interstate and international commerce; with a willful attempt to limit competition by creating artificial, and arbitrary, barriers to entry in the markets of legal education, legal practice, and accreditation of law schools; and having an overall adverse effect on perspective lawyers, actual lawyers, legal education. By the very definition of the alleged actions stated in this paragraph, the violation of Section II of the Sherman Act is a substantial violation in addition to being a per se antitrust violation.

### Issue 4B: Specific Evidence Supporting Antitrust Cause of Action

57.     The most significant issues which will need to be demonstrated in order to prove the previously alleged antitrust violation will be the following:

(1)     The Plaintiff was actually and proximately harmed by the antitrust violation thus providing him with a remedy as required for a cognizable claim for relief in any court;

(2)     The parties, both individually and collectively, possess monopoly power in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).;

(3)     The parties colluded together, or minimally worked together in a manner which can only be for the purpose of obtaining or maintaining market power developed from prohibited activities or anticompetitive activities. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).;

(4)     The consumers in a market are harmed by the anticompetitive behavior by way of higher prices, decreased innovation, or decreased product quality;

(5)     The behavior affects interstate commerce;

(6)     In order to overcome a Parker Immunity defense raised by a state agent [*Parker v. Brown*, 317 U.S. 341 (1943)]: the State Agencies (in this case the State Bar and State Board of Law Examiners in Michigan) are comprised of market participants and are either acting outside the scope of the State Supreme Courts' mandate or the State is not actively monitoring the state agency. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791 (1975); *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *N.C. State Board of Dental Examiners v. FTC*, 135 S. Ct. 1101 (2015).;

(7)     in order to overcome Noerr-Pennington Immunity raised by an entity which lobbies the government for legislation, executive action, or judicial decisions [*Eastern Railroad Presidents Conference v. Noerr Motor Freight.*, 365

U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965)], which would likely be raised by the American Bar Association "Section" (but also could be raised by the University of Hawaii, the AALS, and the NCBE), would need to be found to have violated antitrust regulations in activities outside of petitioning State and Federal Agencies (or State Agencies); the actions were misrepresentations of fact constituting unprotected speech under the 1st Amendment (similar to defamation cases); or were actions conducted by market participants in which the petitioner exercised market power, in an attempt to influence standards of conduct by petitioning a governmental entity in a private setting [*See Allied Tube and Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-07 (1988)]. *Zavaletta v. American Bar Ass'n*, 721 F.Supp. 96 (E.D. Vir. 1989); *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982); *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 427, 110 S. Ct. 768, 777, 107 L. Ed. 2d 851 (1990); *But See Allied Tube & Conduit Corp.*, at 506-507).

   58.   In *Noerr*, then, the political context and nature of the activity precluded inquiry into its antitrust validity. Here the context and nature of the activity do not counsel against inquiry into its validity. Unlike the publicity campaign in *Noerr*, the activity at issue here did not take place in the open political arena, where partisanship is the hallmark of decision-making, but within the confines of a private standard-setting process. The validity of conduct within that process has long been defined and circumscribed by the antitrust laws without regard to whether the private standards are likely to be adopted into law. See *supra*, at 1937–1938. Indeed, because private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits, see *ibid.*, the standards of conduct in this context are, at least in some respects, more rigorous than the standards of conduct

prevailing in the partisan political arena or in the adversarial process of adjudication.

*Allied Tube & Conduit Corp.*, 108 S. Ct. at 1940.

59.    The activity at issue here thus cannot, as in *Noerr,* be characterized as an activity that has traditionally been regulated with extreme caution, see *Noerr,* 365 U.S., at 141, 81 S.Ct., at 531, or as an activity that "bear[s] little if any resemblance to the combinations normally held violative of the Sherman Act," *id.,* at 136, 81 S.Ct., at 529. And petitioner did not confine itself to efforts to persuade an independent decisionmaker, cf. *id.,* at 138, 139, 81 S.Ct., at 530 (describing the immunized conduct as "mere solicitation"); rather, it organized and orchestrated the actual exercise of the Association's decision-making authority in setting a standard. **1941 Nor can the setting of the Association's Code be characterized as merely an exercise of the power of persuasion, for it in part involves the exercise of market power. The Association's members, after all, include consumers, distributors, and manufacturers of electrical conduit, and any agreement to exclude polyvinyl chloride conduit from the Code is in part an implicit agreement not to trade in that type of electrical conduit. Cf. *id.* at 136, 81 S.Ct., at 529.

*Allied Tube & Conduit Corp.*, 108 S. Ct. at 1941

60.    The Plaintiff has created a third binder with evidence exhibits related to demonstrating the ABA, the ABA "Section", the AALS, the NCBE, the University of Hawaii and the WSRSL, the State of Michigan Bar Association, and the State of Michigan Board of Law Examiners have repeated violated antitrust regulations and as a result of their actions have created a system which limits the practice of law to (in the State of Michigan) primarily only people who have graduated from an ABA "Section" accredited Law School and meet arbitrary standards of character and fitness designed to further restrict competition in the legal field. Further, the standards and rules spread by the ABA and the AALS to the State associations does not conform to the mandates by the State Supreme Court or the Department of Education (due to neither organization encouraging explicit discrimination against people qualified to practice the law) resulting in decreased competition among law schools, decreased access to law schools by

people who, for any reason, did not excel at a law school originally, and has fundamentally decreased law school education innovation for over 100 years.

### Issue 4C: Overwhelming Public Interest in the Antitrust Cause of Action Being Heard Fairly and in a Transparent Manner

61.     The antitrust element of this case is for the purpose of setting a precedent against the behavior of the alleged entities in an effort to alter the narrow view of what is considered "acceptable" legal education. The entire purpose of the ABA since its founding has been to create standards by which others are required to adhere to and was significantly aided by Christopher Columbus Langdell's casebook method of legal education. The casebook method necessitated the formal practice of legal education in a manner which did not exist prior to the theory being applied at the Harvard School of Law. To this day the casebook method of teaching is commonly found in law schools and goes by the name "the Socratic Method"; which in the opinion of the Plaintiff is a bastardization of the method Socrates utilized. See E.g. 3 Benjamin Jowett, The Dialogues of Plato 241-578 (3d ed. 1892).

62.     The ABA has already settled once for antitrust violations and received a slap on the wrist in the form of a consent agreement in 1996. *See* Plaintiff's Evidence Exhibit P-9. Further, the ABA was documented as being out of compliance with Federal Statutes by the Department of Education in 2016 which led to "not being able to accredit new law programs" for less than 3 years. At some point the ABA "Section", and frankly the ABA itself, needs to be held accountable for blatant violations of Federal laws. Just as the University of Hawaii has demonstrated they do not believe they should be subject to laws; the ABA and its "Section" demonstrate repeated contempt for acts of Congress.

63.     This is the rare opportunity where a person capable of litigating against the ABA has suffered damages by their actions; which were caused by violations of the Sherman

Act; with significant portions of the activity which led to the Plaintiff's current situation occurring while the ABA "Section" was sanctioned by the Department of Education for failure to monitor accredited law schools; it can be demonstrated the new standard developed in *N.C. State Board of Dental Examiners,* 135 S. Ct. at 1117, which requires State Agencies are actively supervised when consisting of market participants, were not actively supervised to the level necessary to claim Parker Immunity and even if they had been by the State Supreme Court the State supervisor would have been comprised of market participants as prohibited by *Id.*; and the person who is capable of bringing forth the litigation has had everything related to his future as a lawyer taken from him leaving him with virtually nothing left to lose and no reason to fear retaliation from holding the ABA, the AALS, the NCBE, State Bar Associations, State Board of Examiners, and Law Schools accountable for antitrust behavior.

64.     ¶ 63 demands that public interest and justice outweigh any concerns about convenience to the Defendants in Hawaii. The Plaintiff prays the Federal District Court for the Eastern District of Michigan retain this case so justice can be properly served.

Respectfully submitted via mail this Friday, January 10, 2020,

/s/ Stephen Robert Neale Young

*Stephen Robert Neale Y*

STEPHEN ROBERT NEALE YOUNG
Pro Se Litigant
1801 N. Drexel St.
Dearborn, MI 48128
PH: (313) 510-7597
EM: srntener@gmail.com

BLANK PAGE

# Table of Authorities

**Federal Court Cases**

*Allied Tube and Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .................................. 21, 22

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) ..................... 20

*Eastern Railroad Presidents Conference v. Noerr Motor Freight.*, 365 U.S. 127 (1961) ........... *passim*

*F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ................................... 21

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) ......................................................... 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) .............................................................. 3, 15

*Koster v. American Lumbermens Mutual Casualty Co.*, 330 U.S. 524 (1947) ....................................... 4

*N.C. State Board of Dental Examiners v. FTC*, 135 S. Ct. 1101 (2015) ........................................ 20, 24

*Parker v. Brown*, 317 U.S. 341 (1943) ........................................................................ 20

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ............................................................ 3

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) ............................................ 21

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ........................................................ 20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..................... 20

*Duha v. Agrium, Inc.*, 448 F.3d 867 (6th Cir. 2006) ..................................................... *passim*

*Interamerican Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487
(6th Cir. 1992) ............................................................................................. 11

*Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369 (6th Cir. 1999) ................................. 10

*Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227 (6th Cir. 1995) .................................................... 11

*Wong v. PartyGaming Ltd.*, 589 F.3d 821 (6th Cir. 2009) ...................................................... 9, 11

*Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982) .............................................. 21

*Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984) ................................................ 14, 15

*Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d 62 (2d Cir.1981) ................................... 15

*Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) ........... 21

*Zavaletta v. American Bar Ass'n*, 721 F.Supp. 96 (E.D. Vir. 1989) ................................... 21

**United States Constitutional Amendments**

U.S. Const. Amend. 1 ......................................................................................... 21

U.S. Const. Amend. 5 ......................................................................................... 10, 17

**United States Congressional Acts**

15 U.S.C. § 1 et seq. ................................................................................... *passim*

18 U.S.C. § 1961 et seq. ................................................................................... 15, 17

28 U.S.C. § 1404 (a) ....................................................................................... 3, 8

28 U.S.C. § 1915 (e)(1) ............................................................................................................ 4, 5

**State Supreme Court Rules**

Haw. Super. Ct. R. 1.9 ............................................................................................................ 4, 5

**Books**

3 Benjamin Jowett, The Dialogues of Plato 241-578 (3d ed. 1892) ....................................... 23

# PRIORITY®
## ★ MAIL ★



- DATE OF DELIVERY SPECIFIED*
- USPS TRACKING™ INCLUDED*
- INSURANCE INCLUDED*
- PICKUP AVAILABLE

* Domestic only

## FRAGILE

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.



## Confidential Legal filing

Legal Flat Rate Envelope
EP14L February 2014
OD: 15 x 9.5

P S00001000040

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**UNITED STATES POSTAL SERVICE.**



**UNITED STATES POSTAL SERVICE**

## Click-N-Ship®

**P**

PRIORITY MAIL 1-DAY™

Expected Delivery Date 01/13/20

0021

C008

Ship
TO: U.S. DISTRICT COURT CLERK
231 W. LAFAYETTE BLVD FL 5
ROOM 599
DETROIT, MI 48226-2700

STEPHEN R TZ KING
1601 OREGAN ST.
DEARBORN MI 48126-162

Electronic Rate Approved #038555749

USPS TRACKING #

9405 5036 9930 0228 8185 49

